1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                     DALLAS DIVISION

3   UNITED STATES OF AMERICA,      )   **Case No. 3:12-CR-0003-P-1**
                                    )
4         Plaintiff,               )   Dallas, Texas
                                    )   August 28, 2012
5   v.                             )   1:00 p.m.
                                    )
6   SAMUEL GEORGE HURD, III,       )   GOVERNMENT'S EX PARTE MOTION
                                    )   FOR ARREST AND REVOCATION OF
7         Defendant.               )   PRETRIAL RELEASE [45]
    _____)

8                 TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE JEFF KAPLAN,
              UNITED STATES MAGISTRATE JUDGE.
10
    APPEARANCES:
11
    For the Government:         Gary Tromblay
12                              John Kull
                                UNITED STATES ATTORNEY'S OFFICE
13                              U.S. DEPARTMENT OF JUSTICE
                                1100 Commerce Street, 3rd Floor
14                              Dallas, TX  75242-1699
                                (214) 659-8600
15
    For the Defendant:          Jay Ethington
16                              LAW OFFICES OF JAY ETHINGTON
                                3131 McKinney Ave, Suite 800
17                              Dallas, TX  75204
                                (214) 740-9955
18
    For the Defendant:          Reid Manning
19                              3131 McKinney Avenue, Suite 800
                                Dallas, TX  75204
20                              (214) 740-9955

21  Court Recorder:             Vila Fisher
                                UNITED STATES DISTRICT COURT
22                              1100 Commerce Street, Room 1611
                                Dallas, TX  75242-1003
23                              (214) 753-2165

24

25

```
 1  Transcription Service:        Kathy Rehling
                                  311 Paradise Cove
 2                                Shady Shores, TX   76208
                                  (940) 498-2402
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by digital sound recording;
25              transcript produced by transcription service.
```

1          DALLAS, TEXAS - AUGUST 28, 2012 - 1:07 P.M.

2          THE COURT:  Cause No. 3:12-CR-3, Samuel Hurd.  Mr.

3    Hurd, if you'd come to the podium, please.

4          MR. TROMBLAY:  Gary Tromblay and John Kull for the

5    Government.

6          MR. ETHINGTON:  Your Honor, Jay Ethington and Reid

7    Manning for the Defendant.

8          THE COURT:  Okay.  We're here on a motion to revoke

9    the Defendant's pretrial release.  Mr. Ethington, are you ready

10   to proceed?

11         MR. ETHINGTON:  Yes, Your Honor.

12         THE COURT:  And Mr. Tromblay, are you ready to

13   proceed?

14         MR. TROMBLAY:  The Government's ready, Your Honor.

15         THE COURT:  All right.  Mr. Hurd, you can have a seat

16   there at counsel table next to Mr. Ethington.  Mr. Tromblay or

17   Mr. Kull, you may call your first witness.

18         MR. TROMBLAY:  The Government calls Probation Officer

19   Bustamante, Your Honor.

20         THE COURT:  Sir, if you'd come up here.  Raise your

21   right hand to be sworn.

22      (The witness is sworn.)

23         THE COURT:  You may be seated.  You may proceed.

24      CECILIO BUSTAMANTE, GOVERNMENT'S WITNESS, SWORN

25   BY MR. TROMBLAY:

1  Q    Sir, will you state your name for the record, please?

2  A    Cecilio Bustamante.

3  Q    And how are you employed?

4  A    I'm a United States Probation Officer for the Northern

5  District of Texas, Dallas Division.

6  Q    And how long have you worked in that capacity?

7  A    Almost 22 years.

8  Q    And just briefly tell us what you do on a daily basis.

9  A    Currently, I'm a supervisor, and I supervise the pretrial

10 unit here in Dallas, and our unit supervises defendants who are

11 on pretrial release pending disposition of their cases.

12 Q    Okay.  And are one of the individuals that your office was

13 supervising a Mr. Sam Hurd?

14 A    Yes.  Well, it is our case.  However, San Antonio, the

15 Western District of Texas, San Antonio Division, is or was

16 providing courtesy supervision for our office.

17 Q    They had the hands-on supervision, but Angela Roberson with

18 your office was the Northern District of Texas contact?

19 A    Yes.  She was the keeper of our file.

20 Q    Okay.  And do you all have a joint filing computer system

21 wherein you can look at individuals that are placed on

22 probation as a courtesy, as was done here, in the Western

23 District?

24 A    Well, we have the ability to look in PACER and to see

25 what's going on in jurisdictions throughout the United States.

1    However, any information that we obtain or that we get from the

2    district providing courtesy supervision is usually provided by

3    the supervising officer.

4    Q    Okay.  And the supervising officer was an individual in the

5    Western District named whom?

6    A    Craig Pair.

7    Q    Okay.  And did Craig Pair share his file with you once the

8    supervision -- or revocation was set for this Court?

9    A    Yes.  He shared the information that he had.

10   Q    And did the file contain a picture of Mr. Hurd?

11   A    I'm sorry?

12   Q    Did the file contain a picture of Mr. Burr?

13   A    Oh, our electronic file, our -- what we call our PAX

14   (phonetic) system, does contain a picture of Mr. Hurd.

15   Q    Okay.  So, the same person that was on supervised --

16   pretrial release in the Western District through the courtesy

17   of the Northern District of Texas, you have a photograph of Mr.

18   Hurd?

19   A    Yes, in our office.

20   Q    He's here in court today?

21   A    Yes, he is.

22   Q    Will you please point where he is for Judge Kaplan?

23   A    He is seated between Mr. Ethington and -- and I'm sorry,

24   other defense counsel.

25             MR. TROMBLAY:  Your Honor, let the record reflect this

1   witness identified the Defendant in open court.

2          THE COURT:  So noted.

3   MR. TROMBLAY:

4   Q   Will you describe, please, we have alleged two violations

5   of -- well, actually, three violations of the Pretrial Services

6   report when he was placed on supervised release.  Will you

7   please describe for the Court the dirty UA allegations?

8   A   Yes.  According to Mr. Pair, Mr. Hurd submitted a urine

9   specimen on May 14, 2012 which tested positive for marijuana.

10  On May 17th, Mr. Pair called Mr. Hurd into his office, and Mr.

11  Hurd admitted to the use of marijuana on that date.  On July

12  12, 2012, Mr. Hurd again submitted another urine specimen which

13  tested positive for marijuana.  Again, Mr. Hurd was brought

14  into the office, and he admitted verbally and in writing to Mr.

15  Pair that he had used marijuana on that date.  In between those

16  dates, Mr. Hurd was referred to counseling to get help for his

17  drug use.

18  Q   Okay.  Well, let's break those down.  On -- when did this

19  -- the first urinalysis was taken on or about May 14th of 2012?

20  A   Yes, sir.

21  Q   Okay.  And describe for the judge the procedure.  Is that a

22  random urinalysis?

23  A   Yes.  It's our understanding that Mr. Hurd was placed in a

24  random UA program where he has to call on a daily basis to find

25  out whether or not he is required to report to a certain

1    location to submit a urine specimen.

2    Q    And for some history for the judge, the case was

3    transferred from the supervision of the Southern District of

4    Illinois to the Western District on or about March 12th?

5    A    Yes, sir.

6    Q    And then he began taking urinalyses, the first urinalysis

7    was on March 28th.  Is that correct?

8    A    Correct.

9    Q    Now, on the May 14, 2012 urinalysis, what did it test

10   positive for?

11   A    THC, which is the substance that's tested for for

12   marijuana.

13   Q    Three days later, he reports to Mr. Pair, his supervisor?

14   A    Yes, sir.

15   Q    Okay.  And does he admit at that time that he had used

16   marijuana?

17   A    Yes, he did.

18   Q    And is there a sheet that the office uses when somebody has

19   a written verification of the testing positive?

20   A    Yes.

21   Q    And do you have that in your file?

22   A    Yes, sir.

23   Q    And did in fact Mr. Hurd on May 17, 2012 sign that

24   indicating that he had in fact used marijuana?

25   A    Yes, he did.

1  Q    Okay.  And not contesting the results of the lab at that

2  time?

3  A    Correct.

4  Q    Okay.  Now, was Mr. Hurd given another urinalysis when he

5  reported to Mr. Pair on May 17, 2012?

6  A    Yes, he was.

7  Q    Okay.  And what were the results of that?

8  A    It was -- it came back positive as well for marijuana.

9  Q    Did the probation officer at that time, Mr. Pair, have a

10  conversation or does your file indicate he had a conversation

11  with the lead chemist that had taken -- that was responsible

12  for the urinalysis?

13  A    According to Mr. Pair, upon receiving the results of the

14  second urinalysis, which was taken on May 17th, he contacted

15  Senior Drug Analyst Rene Ramon there in the Western District of

16  Texas to discuss the results, and Mr. Ramon indicated that it

17  was not clear whether or not the positive was from new use or

18  whether it was residual from prior use.

19  Q    And did you contact the head chemist, Mr. Ramon?

20  A    Yes, I did.

21  Q    Okay.  And did he tell you anything about the increase or

22  decrease of the TH level with regard to the urinalysis on 5/17?

23  A    Yes, he did.  The level of THC in the specimen that Mr.

24  Hurd provided on May 14th was 103, and the THC levels in the

25  specimen Mr. Hurd provided on May 17th was 108.  So there was a

1    slight increase.

2    Q    Okay.  Now, the next urinalysis that tested positive, will

3    you please describe for the Court the one that occurred on July

4    12, 2012?

5    A    Yes.  The specimen that Mr. Hurd submitted on July 12th had

6    a THC level of 102.  And when he was brought in by Mr. Pair to

7    discuss that positive on the 19th, on July 19th, the urine

8    specimen submitted on that date came back with a THC level of

9    75.

10   Q    So that one had decreased?

11   A    Yes, sir.

12   Q    Now, with regard to the -- once again, on the July 12, 2012

13   meeting, was that a random urinalysis?  Sche...

14   A    Yes, sir.

15   Q    Scheduled?

16   A    Yes, sir, it was.

17   Q    Okay.  And so he came in and provided a specimen on July

18   12th, then on July 19th he had a meeting with Mr. Pair?

19   A    Correct.

20   Q    Now, at that point, in his meeting on July 19, 2012 with

21   Mr. Pair, did Mr. Hurd acknowledge that in fact he had used

22   marijuana on or about July 12th?

23   A    Yes, sir.  He did.

24   Q    And his specimen would be positive?

25   A    Correct.

1    Q    And once again, was there another one of those sheets

2    filled out where a person can in writing verify that he had

3    used marijuana?

4    A    Yes.

5    Q    And did Mr. Hurd do that on July 19, 2012?

6    A    I'm sorry.  Not for July 19th, but for -- yes, on July 19th

7    for the specimen taken July the 12th, yes.  That is correct.

8    I'm sorry.

9    Q    Okay.  And once again, with July 19th, did he provide

10   another specimen at Mr. Pair's request?

11   A    Yes, he did.

12   Q    Okay.  And what were the results of that?

13   A    It was positive for marijuana.

14   Q    Okay.  And once again, did Mr. Pair have a conversation

15   with the chemist involved in the testing of the urinalysis?

16   A    Yes, he did.

17   Q    Or of the urine.  I'm sorry.  And Mr. Pair decided not to

18   file those, the ones that occurred on May 17th and on July

19   19th, for what reason?

20   A    Because it wasn't -- it wasn't conclusive as far as whether

21   or not it was residual use or new marijuana use.

22   Q    Now, after his first positive urinalysis on May 14, 2012,

23   was Mr. Hurd enrolled in any type of drug counseling?

24   A    Yes.  He was referred for individual and group counseling

25   with Life [sic] Recovery.  They're in San Antonio.

1  Q   And that would have been on May 24, 2012 was his first

2  intake, was his first assessment?

3  A   Yes, sir.

4  Q   So, after he was enrolled in the Lifetime Recovery, he

5  tested positive for marijuana while undergoing counseling.  Is

6  that correct?

7  A   Yes, sir.

8  Q   Did Mr. Hurd have a location where he had informed the

9  Probation Office he was living at the time he was under

10 supervision in the San Antonio Office?

11 A   Yes.

12 Q   And what address was that?

13 A   1027 Windy Pond, San Antonio.  I don't know the ZIP Code.

14 Yes, 1027 Windy Pond.  I don't have a ZIP Code, sir, but it is

15 San Antonio, Texas.

16 Q   And just so we're clear, it looks like Mr. Hurd had

17 attended the Lifetime Recovery, the counseling that had been

18 ordered or requested by the Probation Department, on May 24th,

19 July 13th -- I'm sorry.  He missed July the 13th, didn't he?

20 June 19th, June 27th, and June [sic] 11th, he had attended

21 either group or individual meetings with the Lifetime Recovery.

22 Is that correct?

23 A   Yes.

24 Q   Okay.  And then after the July 11th meeting, the sample for

25 July 12th was positive?

 1  A    Yes.

 2  Q    Okay.  Now, after the -- can you please describe for Judge

 3  Kaplan what occurred after the first urinalysis?  Was the Court

 4  notified or was the Government notified about the first dirty

 5  urinalysis for marijuana?

 6  A    No, the Court was not.  Officer Pair went ahead and

 7  notified our office and went ahead and referred Mr. Hurd to

 8  counseling.  At that time, Ms. Roberson was out for about a

 9  month and a half due to an illness, and at some point she did

10  forward that to me, and -- but before I could notify the Court,

11  we got the results of the second positive.

12  Q    And at that point, after the results of the second

13  positive, you contacted our office?

14  A    Yeah.  Ms. Roberson was back in our office, and she did

15  contact Judge Kaplan.  We filed our report and also notified

16  the U.S. Attorney's Office.

17  Q    Okay.  And when the Defendant was arrested for this offense

18  back on December 14th, did he give a urinalysis the next day to

19  the Pretrial Services up in Chicago?

20  A    I believe he gave the urinalysis the very first -- when he

21  was interviewed.

22  Q    On 12/14?

23  A    Yes.  On the day of his arrest.

24  Q    And was an addendum made to the Pretrial Services report to

25  reflect whether or not that had tested positive?

1    A    Yes.

2    Q    Okay.  And what was the results of that?

3    A    It tested positive for marijuana.

4    Q    But in fairness to Mr. Hurd, he wasn't on supervised

5    release at the time; that was just after his initial arrest?

6    A    Correct.

7         MR. TROMBLAY:  That's all I have, Your Honor.  Thank

8    you.

9         THE COURT:  Cross-examination?

10                   CROSS-EXAMINATION

11   BY MR. ETHINGTON:

12   Q    Mr. Bustamante, can you tell the Court how many urinalysis

13   tests have been conducted on Mr. Hurd from December of when he

14   was arrested up until today?

15   A    I don't have the information from the UAs or the urine

16   specimens he collected while in Illinois, but I do have the

17   dates that the San Antonio office tested him as far as the ones

18   that came back with negative results.  The ones with the

19   positive results have been already given here in court, but he

20   submitted a urine specimen March the 28th, April the 12th,

21   April the 25th, May 30th, June 12th, June 21st and July 27th,

22   all of this year.

23   Q    And those were negative --

24   A    Yes, sir.

25   Q    -- results?

1    A    Those were negative results.

2    Q    And on these urinalysis tests, it wasn't just for

3    marijuana; it was for a whole array of chemicals, wasn't it?

4    A    Yes, sir.

5    Q    Cocaine and amphetamines and methamphetamines and the whole

6    drug spectrum, I guess you'd say?

7    A    It's my understanding that, yes, I'm not aware of any

8    specific tests requested, because you can narrow the scope of

9    drugs being tested for.

10   Q    The test result reports that you have before you show that

11   Mr. Hurd was tested for cocaine, certainly, wasn't it?  Wasn't

12   he?

13   A    Just a moment.  (Pause.)  Yes, sir.  He was --

14   Q    And --

15   A    -- tested for cocaine, opiates, amphetamines and

16   cannabinoids.

17   Q    And all of those tests regarding cocaine, the result was

18   negative, correct?

19   A    Yes, sir.

20   Q    You mentioned that -- I was a little bit confused and I'll

21   try to clear it up quickly -- there were four positive results

22   on four separate tests, but the chemist advised you that it was

23   his opinion that that could be residual marijuana in the urine

24   because of declining values, is that it?

25   A    Yes, sir.  His initial positive was confirmed, and it was

Bustamante - Cross                    15

1   also admitted to by Mr. Hurd.  But when he came in and admitted

2   to the use, to using on the -- for the first positive, another

3   urine specimen was submitted by him on that same date, and the

4   analyst wasn't -- couldn't with 100 percent certainty say that

5   it -- whether it was residual or new use.  And so that's why

6   that one was not reported, because we weren't clear on it.

7   Now, the second, the -- I guess it would be the second

8   confirmed UA positive, the same thing.  He tested positive for

9   marijuana.  He was brought into the office.  He admitted to

10  use.  And on that same day, another urine specimen was

11  collected, which tested positive for marijuana.  But again, the

12  analyst wasn't quite certain whether it was residual, or

13  couldn't say with 100 percent certainty whether it was residual

14  or new use.

15  Q   Mr. Bustamante, did you actually have conversations

16  directly with Mr. Peer -- I guess it's Pear?

17  A   Yes, sir.  Pair.

18  Q   Like the fruit?  Pear?

19  A   P-A-I-R.

20  Q   Oh, Peer?  Pair?

21  A   Pair.

22  Q   Mr. Pair in San Antonio, the direct supervisor of Mr.

23  Hurd?

24  A   Yes, sir.

25  Q   And you've talked to him on the phone?

1  A    Yes, sir.

2  Q    And didn't he report you that Mr. Hurd in all respects,

3  other than the flunking of these two UAs, that he was

4  cooperative?

5  A    Yes, sir.  He did say that.

6  Q    And in fact, responsive when he was asked the question,

7  have you been smoking marijuana, we've got a test result here

8  that indicates it?  He confessed to that, didn't he?

9  A    Yes, sir.

10 Q    Did Mr. Pair report any other negative activity on the part

11 of Mr. Hurd?  You know, that is uncooperativeness or other

12 violations?

13 A    No, sir, he did not.

14 Q    Did you have -- have you had any direct communication or

15 contact with Mr. Hurd?

16 A    No, sir.

17 Q    Has Ms. Roberson?  Do you know?

18 A    Um, I think there were a few attempts by Ms. Roberson to

19 contact Mr. Hurd by telephone, but I think they just kept

20 missing each other.

21 Q    Okay.

22 A    And I think that was during the time that Mr. Hurd was

23 moving from Illinois to San Antonio.

24 Q    Relocation process?

25 A    Yes, sir.

1  Q    Okay.  Mr. Hurd at one time I guess had a passport.

2  Doesn't your file reflect that?

3  A    Yes, sir.

4  Q    And he doesn't any longer; he's voluntarily surrendered

5  that to the district clerk?

6  A    Yes, sir.

7  Q    Was that done in San Antonio, Dallas or Chicago?

8  A    In Chicago.

9  Q    And do you have any reports that you could share with the

10  Court on this drug counseling activity that occurred from May

11  14th of this year to July 12th at least, and then I would take

12  it further even after that?

13  A    I've got the monthly treatment reports.

14  Q    Can you summarize for the Court's benefit?  Was it -- was

15  he attentive or responsive or did what he was told to do, at

16  least?

17  A    The reports indicate that Mr. Hurd has been participating

18  but that he at this time is still in denial about his -- about

19  his use, and according to the counselor, he did tell the

20  counselor that he had admitted to using marijuana.  But as far

21  as he seems to be participating, and he is both group and

22  individual counseling.  And Mr. Pair did indicate that he had

23  advised Mr. Hurd to take advantage of the individual counseling

24  --

25  Q    Uh-huh.

1  A    -- as well.

2  Q    And Mr. Hurd did that?

3  A    Yes, sir.

4  Q    When you said that he's in denial, from the records that

5  you might have available to you or conversations you had with

6  Mr. Pair, he's -- he was not in denial of using marijuana but

7  in denial of it being harmful to you as an illegal narcotic.

8  Isn't that really what the denial was about?

9  A    It's not clear.  It's just -- it's just one sentence here.

10 (reading)  "Client is attending and participating in group and

11 individual session, but remains in denial."  It -- no -- it

12 doesn't offer any other explanation.

13 Q    Okay.  Do you have a recommendation for the Court as to

14 what the Probation Office or the Pretrial Service Office in

15 Dallas would think the appropriate outcome of this hearing is?

16 A    I spoke to Mr. Pair, because he's the officer supervising

17 Mr. Hurd, and he said he would be willing to continue to

18 supervise Mr. Hurd if the Court saw fit.

19 Q    So we have -- do you know anything about Mr. Pair's

20 experience and background and expertise in supervising people

21 --

22 A    Well, I know he's been in the system for quite a long time,

23 and right now he's the Program Development Coordinator for the

24 Western District of Texas.

25 Q    That places him in a senior position at the --

1   A    Yes, sir.

2   Q    -- Pretrial Services in San Antonio?  And his

3   recommendation is, if the Court sees fit, he would accept Mr.

4   Hurd back in supervision, maybe under some certainly more

5   restrictive conditions?

6   A    Yes, sir.

7   Q    Okay.  There was some direct testimony about the address,

8   and I want to clear this up.  1028 -- is it Windy Pond?

9   A    I believe it's 1027 Windy Pond.

10  Q    Okay.  1027 Windy Pond.  And there was a reference to that

11  I guess residence.  Do you -- does your records reflect or do

12  you know from your conversations with Pretrial Services in San

13  Antonio whether that was his residence?

14  A    It -- that's the address of record that we have in our

15  system.  When he transferred from Chicago to San Antonio, that

16  was the address that the Chicago office provided, or that Mr.

17  Hurd provided the Chicago office and they in turn provided that

18  to us.  And it -- I believe it's his sister's residence.

19  Q    Okay.  A sister's residence?

20  A    Yes.

21  Q    Have you had any conversations with any family members?

22  A    No, sir.

23  Q    Has -- do you know if Ms. Roberson has had conversations

24  with family members?

25  A    I'm not aware of any conversations.

1   Q    And how about representatives of the Pretrial Services in

2   San Antonio?  Have they had the, you know, the house visit and

3   the telephone conversations that are pretty standard with

4   family members, checking on a person that's released?

5   A    I don't have any information, sir.  I don't know.

6   Q    In the event there might have been some suggestion about

7   location difficulties, does your records reflect or your file

8   reflect or any of your investigation or analysis reflect that

9   there was any problem with Mr. Hurd's location?  You know,

10  having trouble finding him or running off?

11  A    There's no information indicating any of that.

12  Q    Do you have a professional opinion as to whether or not he

13  is a flight risk?

14  A    All I can go by is the information that Mr. -- Mr. Pair

15  supervised him firsthand, so we're just kind of going off of

16  his reports and his recommendations.

17  Q    Right.  Well, that's fair, because he's the hands-on --

18  A    Correct.

19  Q    -- arm-around guy that is interacting with the releasee,

20  correct?

21  A    Yes, sir.

22  Q    And he didn't express any concerns about Mr. Hurd being a

23  flight risk, did he?

24  A    Not to me.

25  Q    Okay.

1    A    He did not.

2          MR. ETHINGTON:   Thank you, Your Honor.   That's all we

3    have, Mr. Bustamante.

4          THE COURT:   Any redirect?

5          MR. TROMBLAY:   Just briefly, Your Honor.

6                        REDIRECT EXAMINATION

7    BY MR. TROMBLAY:

8    Q    Mr. Pair's analysis of the flight risk or the satisfactory

9    level of Mr. Hurd's participation in the supervised release, is

10   that based on the two dirty urinalysis tests?   In other words,

11   he's not basing his opinion that he would supervise him again

12   based on the new allegation of drug trafficking, is he?

13   A    No.   Just on -- just on the urinalysis.   And, I mean, he

14   doesn't feel that Mr. Hurd is a flight risk based on his

15   positive urinalysis.

16   Q    But his recommendation was exclusive of the new drug

17   trafficking charge that Mr. Hurd is alleged to have committed?

18   A    Correct.

19   Q    Okay.   Now, do your records reflect whether or not Mr. Hurd

20   was working or seeking employment?

21   A    I have no information as to Mr. Hurd's employment.

22   Q    So we don't know whether he's employed or seeking

23   employment as required?

24   A    No, sir.

25   Q    Okay.

1                MR. TROMBLAY:  Thank you, Judge.  That's all I have.

2                          RECROSS-EXAMINATION

3  BY MR. ETHINGTON:

4  Q   Mr. Bustamante, on this what's been referred to as a new

5  drug charge, that was known and disclosed to Mr. Pair prior to

6  or at the time that Mr. Hurd was arrested in San Antonio on

7  this violation and warrant that this Court issued, right?  Is

8  that right?

9  A   Yes.  And -- but -- and I'm sorry if I misspoke.  But when

10  we were -- when I was talking to Mr. Pair earlier, he -- we

11  were talking about the positive UAs and the drug counseling.

12  You know, as far as flight risk, he didn't feel like he was a

13  flight risk.

14       Now, as far as danger to the community, that's -- his

15  recommendation would be, if the judge saw fit to release him,

16  to possibly include home detention, and GPS monitoring

17  possibly.

18  Q   Okay.  There we are.  In fact, when this information was

19  developed about the positive urinalysis tests and this

20  additional charge that stems from a fellow named Chavful, when

21  that was all developing and being presented, both I guess here

22  to this Court and also then the information was transferred

23  down to San Antonio, Mr. Pair was aware of this additional I

24  guess new criminal charge that arises from a fellow named

25  Chavful, was he?

1   A   Well, the -- and I think he was, really, we were more

2   talking about the fact that our office, the Pretrial Office,

3   the only thing -- the things that we stated in the violation

4   report were the positive urinalysis.  You know, at the time

5   when the report was submitted, we did not have any information

6   as to any new criminal activity or alleged criminal activity.

7   Q   Yes.  But then --

8   A   So, --

9   Q   -- simultaneous to your preparation from your office --

10  A   Yes.

11  Q   -- of the urinalysis results, simultaneously or parallel to

12  that the U.S. Attorney's Office here in Dallas was preparing a

13  motion to revoke of their own?

14  A   Yes.

15  Q   And that was based on this alleged Chavful activity,

16  correct?

17  A   Yes.

18  Q   Okay.  And then those two documents, I think maybe both of

19  them were sealed.  So internally in the government, then, they

20  were transferred to the Marshals Service, Probation/Pretrial

21  Services Office, and maybe even the U.S. Attorney's Office and

22  Magistrate's Court, in San Antonio.  Was that the way it worked

23  here?

24  A   Yes, sir.  I think.

25  Q   So, from your knowledge of the activities of this case, as

1   the paperwork was compiled, presented to the Court and

2   transferred to San Antonio, Mr. Pair did have the benefit of

3   this third allegation of violation, that being the alleged

4   Chavful activity.  Is that your understanding?

5   A   Yes, he -- I do believe he is aware of that.

6   Q   And do you know from your personal participation in this or

7   from your referral -- reference to your file, that it was the

8   San Antonio Pretrial Services Office's recommendation to have a

9   summons issued rather than a warrant?

10  A   No.  The summons came from our office, --

11  Q   Okay.

12  A   -- because Ms. Roberson prepared the violation report, and

13  at that point it was based on the information -- the only

14  information we had were the positive urinalysis reports.  At

15  that point, we didn't have any information as to any ongoing

16  criminal activity or alleged criminal activity.

17  Q   As a procedural matter, and maybe this doesn't have any

18  impact on the proceedings here, but you're required by statute

19  when you have a violation at least that appears to be a

20  legitimate violation of conditions of release, you're required

21  to report it to the Court and to the U.S. Attorney's Office?

22  A   Yes, sir.

23  Q   But if the U.S. Attorney's Office has an indication there

24  might be some violation, continuing criminal conduct or

25  something, they're not required to present it to you --

1   A    No, sir.

2   Q    -- or the Court unless they deem it appropriate?

3   A    Well, I know -- I know the Government did file a motion

4   with the Court to -- asking for a warrant, but they're not

5   required to staff with us or even -- they do it out of

6   courtesy, to let us know that, you know, there might be some

7   activity going on.

8   Q    Was that done in this case?

9   A    Yes, it kind of -- it all came together sort of at the same

10  time.  It was kind of interesting, the way it all -- it just

11  kind of -- our office got in contact with their office, and

12  they seemed to be working on it at the same time, so --

13  Q    Did you review this background information on this what

14  we'll call the alleged violation, continuing drug alleged

15  violation?  Did you --

16  A    I just briefly looked at it.  Since it wasn't coming from

17  our office, I just read it just to kind of get an idea of what

18  was going on.

19  Q    So, you deferred -- on that decision-making process, you

20  deferred to the U.S. Attorney's Office --

21  A    Yes, sir.

22  Q    -- because that's really their bailiwick and you have --

23  A    Yes, sir.

24  Q    -- your responsibilities?

25  A    Yes, sir.

1   Q    Okay.

2   Q    Do you -- did you notice that there was some delay, you

3   know, in the investigation in San Antonio that purportedly is

4   trying -- that involves Mr. Hurd, that investigation?  While

5   he's on supervised release and that investigation involving his

6   so-called cousin?  Do you have any idea you can share with the

7   Court how long that investigation lasted and --

8   A    No, sir.

9   Q    -- why it might not have been reported to you and the Court

10  sooner?

11  A    No, sir.  I -- like I said, I just briefly reviewed it and

12  I thought, okay, you know, the Government's going to present it

13  to the Court and then we'll just go ahead and move forward with

14  our allegations of further drug use.

15  Q    Based on the complete knowledge that Mr. Pair has in San

16  Antonio and that he would be willing to accept Mr. Hurd back in

17  supervision under restriction, do you share that same opinion

18  with your colleague?

19  A    If there is criminal activity going on while under

20  supervision, I would probably recommend detention.

21  Q    Uh-huh.

22  A    But if it was just the positive urinalysis, I think we

23  could work with Mr. Hurd on his ongoing drug problem.

24  Q    Yes.  And as supervisor of Pretrial Services, then, you're

25  familiar with the statutes regarding release on bond and the

1   procedures and all that?

2   A    Certainly.

3   Q    Of course, there's a separate section there that says that

4   these proceedings in no way diminish or impact the presumption

5   of innocence of a person.  You're familiar with that?

6   A    Yes, sir.

7   Q    Okay.  Thank you, sir.

8           THE COURT:  Step down.  Thank you.

9       (The witness steps down.)

10          THE COURT:  Call your next witness.

11          MR. TROMBLAY:  Call Robert Alarcon.

12      (The witness is sworn.)

13          THE COURT:  You may be seated up here.  You may

14  proceed.

15          ROBERT ALARCON, GOVERNMENT'S WITNESS, SWORN

16                  DIRECT EXAMINATION

17  BY MR. TROMBLAY:

18  Q    Would you identify yourself for the record, please?

19  A    Robert Alarcon.

20  Q    Okay.  And Mr. Alarcon, how are you employed?

21  A    I'm a special agent with the Department of Homeland

22  Security, Homeland Security Investigations.

23  Q    Okay.  And how long have you been so employed?

24  A    Ten and a half years.

25  Q    Okay.  Do you conduct criminal investigations on behalf of

1    the Department of Homeland Security?

2    A    Yes, sir.

3    Q    Okay.  And are you the case agent in this case?

4    A    Yes.

5    Q    Are you familiar with the facts and circumstances

6    surrounding the offenses for which Sam Hurd has been indicted

7    for?

8    A    Yes, sir.

9    Q    Let's go back to July 27th of 2011.  Is that when matters

10   got started in this case?

11   A    Yes, sir.

12   Q    Briefly outline to the Court what happened on that day.

13   A    On July 27, 2011, we received a phone call or information

14   from a confidential informant that an individual by the name of

15   Toby Lujan was seeking to purchase four kilograms of cocaine.

16   We directed the confidential informant to make contact with Mr.

17   Lujan and set a predetermined location to meet and conduct the

18   transaction.

19   Q    Okay.

20   A    The --

21           MR. ETHINGTON:  Your Honor, excuse me.  We object as

22   not being relevant.  These are facts that were reviewed --

23           THE COURT:  Overruled.  Proceed.

24           MR. TROMBLAY:  Thank you.

25   BY MR. TROMBLAY:

1    Q    And then what else happened after that?

2    A    At the predetermined location, Mr. Lujan showed up in a

3    black Cadillac Escalade that was registered to Samuel Hurd.

4    That Cadillac Escalade was subsequently pulled over by a Dallas

5    constable.  After a consent to search, the constable located a

6    gym bag which contained a white canvas bag with at the time an

7    undetermined amount of currency.  He requested a K-9.  A K-9

8    subsequently alerted on that bag, and they located marijuana

9    residue with -- inside the bag with the currency.

10   Q    Okay.  And how much cash was ultimately discovered inside

11   that bag?

12   A    $88,000.

13   Q    And how much was the -- was Mr. Lujan supposed to purchase

14   four kilograms of cocaine for?

15   A    $22,000 per --

16   Q    Per kilogram?

17   A    Per kilogram.

18   Q    So the money added up?

19   A    Yes.

20   Q    Okay.  Now, was Toby Lujan's cell phone searched --

21   A    Yes.

22   Q    -- at the scene?

23   A    Yes, sir.

24   Q    And what was noteworthy about that?

25   A    There were several calls from Samuel Hurd to Toby Lujan

Alarcon - Direct                         30

 1   before the CI met or attempted to meet with the -- I'm sorry,

 2   before Lujan attempted to meet with the CI, and subsequent

 3   calls from Hurd to Lujan after he was detained --

 4   Q    Okay.

 5   A    -- and the currency was seized.  Additionally, on Mr.

 6   Lujan's phone, he had a listing of Miguel Dope Boy.

 7   Q    Okay.  Now, the following day, did anyone attempt to claim

 8   the cash that was seized?

 9   A    Yes, sir.

10   Q    Who is that?

11   A    Samuel Hurd.

12   Q    Okay.  Do you see Mr. Hurd in the courtroom today?

13   A    Yes, I do.

14   Q    Did you meet with him personally on that day?

15   A    Yes, I did.

16   Q    Okay.  Would you identify him for the record, please?

17   A    He's the individual wearing an orange shirt seated at the

18   defense table.

19          MR. TROMBLAY:  Your Honor, I'd like the record to

20   reflect that the witness has identified the Defendant in open

21   court.

22          THE COURT:  So noted.

23   BY MR. TROMBLAY:

24   Q    Where did Mr. Hurd appear?

25   A    I'm sorry, sir?

1   Q    Where did he appear when you met him?

2   A    He came to our office in Irving, Texas.

3   Q    Okay.  What did he have to say about the $88,000 that was

4   seized from his Cadillac Escalade?

5   A    He said that the money was his, he had withdrawn it on that

6   Monday, which was July the 25th, 2011, that he had conducted

7   one transaction in the amount of $100,000 and that the currency

8   was -- he was going to give it to his mother to purchase a

9   house in San Antonio, Texas.

10  Q    Did you show him a picture of the Cadillac?

11  A    Yes.

12  Q    What did he say about that?

13  A    He said that was his Cadillac.

14  Q    What did he say about the gym bag?

15  A    He said -- we showed him a photo of the gym bag and he said

16  that was his gym bag that he placed -- he had placed in the

17  vehicle the night before.

18  Q    What about the 88 -- what about the canvas bag?

19  A    The canvas bag containing the currency, he told us that

20  that's how it was given to him by the teller at Chase Bank.

21  Q    What did he say about the marijuana residue that was in

22  that bag?

23  A    When asked about the marijuana, he said that was not his.

24  Q    He couldn't explain it?

25  A    No.

1   Q    Now, did you examine the bank records concerning his story

2   about the withdrawal of this lump sum $100,000 from his bank

3   account?

4   A    Yes, I did.

5   Q    Was his story accurate or inaccurate?

6   A    Inaccurate.

7   Q    Why is that?

8        MR. ETHINGTON:  Objection.  He's not qualified to make

9   some kind of an expert opinion on this.

10       THE COURT:  Overruled.  Proceed.

11       THE WITNESS:  The bank statements showed that he had

12  two withdrawals on that date which he stated, July 25th, 2011,

13  one for $40,000 and one for $30,000.

14  BY MR. TROMBLAY:

15  Q    Now, you're aware that Toby Lujan has been indicted,

16  correct?

17  A    Yes, sir.

18  Q    Has -- since his indictment, has he cooperated with the

19  Department of Homeland Security?

20  A    Yes, he has.

21  Q    And has he debriefed with you about these matters?

22  A    Yes, sir.

23  Q    What did he say was the purpose of him driving Sam Hurd's

24  black Cadillac Escalade with $88,000 in cash?

25  A    It was to go purchase four kilograms of cocaine.

1  Q    And who was he purchasing those drugs for?

2  A    Samuel Hurd.

3  Q    Now, despite this $88,000 in cash seizure, did Sam Hurd

4  continue to -- or, did he cease trafficking drugs?

5  A    No, sir.

6  Q    Let me direct your attention to on or about August/

7  September of 2011.  Now, back in July, how was Sam Hurd

8  employed?

9  A    He was a -- at the time when he initially came into our

10  office, I believe he was still employed with the Dallas

11  Cowboys.  He actually, during the meeting with us, received a

12  phone call and actually told us that that was his agent and he

13  had just been picked up by the Chicago Bears.

14  Q    So in August and September of 2011, who was he employed

15  with?

16  A    Chicago Bears.

17         MR. ETHINGTON:  Object to the relevance.

18         THE COURT:  Overruled.

19  BY MR. TROMBLAY:

20  Q    Now, what activity happened during the months of August and

21  September that showed that Sam Hurd continued his quest in

22  trafficking drugs?

23  A    There was still communications between the confidential

24  informant and Mr. Lujan.

25  Q    Specifically, what happened?

1   A   On September the 9th, Mr. Lujan contacted the confidential

2   informant and told him that he had some guys coming down from

3   Chicago that wanted -- were looking to purchase several

4   kilograms of cocaine.  They had $50,000 on them, looking for

5   several kilograms.

6   Q   Did he say who the ultimate purchaser of the drugs was?

7          MR. ETHINGTON:  Objection as to who "he" is.  It's

8   unclear.

9          THE COURT:  Rephrase the question.

10          MR. TROMBLAY:  Yes, sir.

11   BY MR. TROMBLAY:

12   Q   Now, who did he -- who did Toby Lujan indicate that the

13   drugs were for?

14   A   At that time, I believe -- I don't believe at that moment

15   he had indicated that it was Samuel Hurd, but it was an

16   individual up north.

17   Q   Okay.  Now, back in the fall of 2011, did you know that the

18   Drug Enforcement Administration was investigating an individual

19   by the name of Tyrone Chavful?

20   A   No.

21   Q   Did you later learn that they had?

22   A   Yes.

23   Q   What information did you learn concerning the investigation

24   that the Drug Enforcement Administration was conducting

25   regarding Mr. Chavful that pertained to the Defendant, Samuel

1   Hurd?

2   A   Mr. Chavful had met with three different cooperating

3   individuals working for the Drug Enforcement Administration at

4   the time, and he had negotiated for 10 kilograms of cocaine and

5   a large quantity of marijuana on behalf of Samuel Hurd.

6   Q   Okay.  Now, were any of these matters recorded?

7   A   Yes.

8   Q   Did you listen to the telephone calls?

9   A   Yes, sir.

10  Q   Specifically, was -- were there any telephone activity

11  between Tyrone Chavful and one of the informants on November

12  the 10th, 2011?

13  A   Yes, sir.

14  Q   Specifically outline to the Court what the subject matter

15  of those phone calls were.

16  A   On November the 10th, 2011, a phone call between one of the

17  cooperating individuals and Chavful, Chavful basically was

18  telling the cooperating individual that his cousin up north was

19  requesting some narcotics.  However, he could not be in the --

20  he could not be at the scene to receive them due to him being a

21  public figure or -- and the cooperating individual mentioned

22  that, oh, that's right, he -- because of the media, --

23  Q   Okay.

24  A   -- referring to Mr. Hurd's status.

25  Q   Okay.  Now, I want to direct your attention to December the

1   6th, 2011.  Did Mr. Lujan have further contact with the

2   informant that was working with the Department of Homeland

3   Security?

4   A    Yes, sir.

5   Q    What happened on that day?

6   A    On December -- I'll go back one day, on December the 5th,

7   he spoke with the CI and told him that he needed to -- he

8   needed to speak to the CI in person because he was going to let

9   him speak to Samuel Hurd.  And so they set a meeting for the

10  next day.

11       On December the 6th, 2011, the confidential informant

12  proceeded to meet with Mr. Lujan at his place of employment at

13  the Firestone Auto Center.  They met there, proceeded to sit

14  inside of Mr. Lujan's vehicle.  At that point, after a short

15  brief conversation, Mr. Lujan contacted Samuel Hurd, passed the

16  phone to the confidential informant, where a short introduction

17  and brief conversation was conducted.  The confidential

18  informant basically asked Mr. Hurd how many kilos he was

19  looking for.  Hurd said that his guys from Chicago were headed

20  down to the Dallas area and -- to pick up three.  The

21  confidential informant asked him why he didn't want five, and

22  Mr. Hurd replied that his guys would be in the area on that

23  Saturday and he would tell them to go ahead and purchase the

24  five.

25  Q    Okay.  Now, did Toby Lujan ever provide the CI that was

1   working with the Department of Homeland Security with Sam

2   Hurd's cellular telephone number?

3   A   Yes, sir.

4   Q   Based upon that, did the CI have any telephonic

5   communication directly with Sam Hurd after this meeting?

6   A   Yes.

7   Q   Specifically, what happened?

8   A   He had talked to him and basically told him that the -- he

9   was referring to those five kilograms that the friend -- his

10  guys were going to come down and pick up on that Saturday.  He

11  told him that the shipment -- he concocted -- the CI concocted

12  a story, directed by us, to tell him that the shipment was

13  delayed because it was headed to Atlanta, therefore, it would

14  have to be -- another shipment would be coming in in

15  approximately two weeks.  And Mr. Hurd said, that's fine with

16  me.  I guess he had some other arrangements he had so the

17  following week was good with him.

18  Q   Okay.  Now, during that telephonic conversation -- by the

19  way, was it recorded?

20  A   Yes, it was.

21  Q   Did -- was there any expression of a meeting that would

22  take place between the CI and Sam Hurd in Chicago?

23  A   Yes.

24  Q   And what was the purpose of that meeting, of that face-to-

25  face meeting?

1   A    To sit down and build a working relationship and discuss

2   narcotics, the purchasing and -- or selling from us and

3   purchasing of narcotics from Mr. Hurd.

4   Q    Based upon that telephone conversation, did the CI and an

5   undercover officer eventually meet with Sam Hurd in the Chicago

6   area?

7   A    Yes.

8   Q    When did that happen?

9   A    On December 14, 2011, we were -- myself, two other agents

10  and the confidential informant were headed to the Chicago

11  office when the confidential informant received a phone call

12  from Mr. Hurd.  I directed the confidential informant not to

13  answer the call because at the moment we weren't prepared to

14  record that conversation.

15      I contacted our counterpart case agent in Chicago to

16  determine what logistical location they had prepared to conduct

17  this undercover operation.  They had predetermined a Ditka's

18  Restaurant in Oak [*sic* throughout] Terrace.  Oak Terrace,

19  Illinois.  And we subsequently had the confidential informant

20  return the call to Mr. Hurd and tell him that we -- the

21  confidential informant told him that they were in the -- that

22  he was in the -- that he and his cousin, cousin being the

23  undercover agent, were in the Oak Terrace area waiting to pick

24  up some currency from drug proceeds and that they requested Mr.

25  Hurd meet them at the Ditka's Restaurant.  Mr. Hurd said that

1   he was from Lake Forest, Illinois and was not familiar with the

2   Oak Terrace area.  At that point, Mr. Hurd invited the

3   undercover agent and the CI to his residence.

4   Q    And what -- did they accept that invitation to meet with

5   him at his residence?

6   A    No.

7   Q    So where did they eventually meet?

8   A    We sat down with the Chicago office and came up with a

9   secondary location, which was the Morton's Steakhouse in

10  Rosemont, Illinois.

11  Q    Okay.  So the undercover officer and the CI met with Sam

12  Hurd at this restaurant?

13  A    Yes, sir.

14  Q    Was the conversation and the meeting recorded?

15  A    Both audio and video.

16  Q    And basically could you outline what happened once the

17  undercover officer and the CI met with Mr. Hurd?  What did they

18  immediately discuss?

19  A    Upon the undercover agent greeting Mr. Hurd, he apologized

20  for not being able to go to Mr. Hurd's house, and Mr. Hurd

21  replied by saying, that's cool.  They then proceeded into

22  narcotics-related discussions.

23  Q    What kind of drugs did they discuss?

24  A    Cocaine.

25  Q    Okay.

1   A    Initially, cocaine.

2   Q    Okay.  Did they agree on quantities and prices eventually?

3   A    Yes.

4   Q    How much drugs -- how much cocaine was Mr. Hurd wanting to

5   purchase per week?

6   A    Ten kilograms.

7   Q    And how much was he willing to pay per kilogram?

8   A    $25,000.

9   Q    After the conclusion of the, okay, we'll do 10 keys per

10  week for $25,000 per key, did Mr. Hurd then request any other

11  type of drugs from the agents?

12  A    Yes, he did.

13  Q    What did he ask?

14  A    He requested for 1,000 pounds of marijuana.

15  Q    Did that come as a surprise to the undercover officer?

16  A    Yes.

17  Q    During their conversations that -- during the conversation

18  that the undercover officer had with Sam Hurd at the

19  restaurant, did Mr. Hurd make any other -- make any complaints

20  or other requests from the undercover officer?

21  A    Yes.  He requested Mexican telephones from the undercover,

22  basically stating that he didn't like U.S. phones because of

23  law enforcement being able to monitor them.  The undercover

24  also proceeded to offer him a Mexican passport and Mr. Hurd

25  agreed.

1  Q   Did Mr. Hurd make any complaints about his current cocaine

2  supplier?

3  A   Yes.  He stated that he -- his current supplier could only

4  supply him with four kilograms weekly.

5  Q   So four kilograms a week wasn't enough for him?

6  A   Correct.

7  Q   Now, did the undercover officer who met with Mr. Hurd at

8  the restaurant, did he bring anything with him to give Mr. Hurd

9  any assurances as to the quality of the cocaine that he would

10 be receiving?

11 A   Yes.

12 Q   What did he bring?

13 A   He brought one kilogram of real cocaine inside a gift -- it

14 was actually a Happy Birthday bag.

15 Q   Okay.  And did the undercover officer specifically tell him

16 what was inside that bag?

17 A   Told him it was 98 percent pure cocaine from Colombia.

18 Q   And what did Mr. Hurd then do?

19 A   He proceeded to, after the UC asked him if he wanted to

20 check it out, he grabbed the bag and kind of manipulated the

21 outside, felt it, and said it's 100 percent.

22 Q   Okay.  Now, after the conclusion of the drug negotiations

23 and the meal, what did Mr. Hurd do with that kilogram of

24 cocaine that was inside the bag?

25 A   He proceeded to walk out of the restaurant with that bag.

Alarcon - Direct                              42

1   Q    And did he give the undercover officer and the CI any

2   instructions about what to do?

3   A    He said that the next day after practice he would meet with

4   them to pay them for the kilogram.

5   Q    After Mr. Hurd left the restaurant with the kilo of cocaine

6   in his possession, what happened?

7   A    He was placed under arrest.

8   Q    Now, are you aware that he was brought before a judge

9   before the Northern District of Illinois in Chicago?

10  A    Yes, sir.

11  Q    And ultimately he was released on conditions of release?

12  A    Correct.

13  Q    Now, I want to direct your attention to late May/early June

14  of 2012.  After you found out that the Drug Enforcement

15  Administration had established ties between Tyrone Chavful and

16  Sam Hurd, did you take any investigative steps to determine

17  whether or not Tyrone Chavful was continuing to traffic drugs?

18  A    Yes.

19  Q    What specifically did you do?

20  A    Had a cooperating individual contact Mr. Chavful, set up a

21  meeting.

22  Q    Was it the same -- was it one of the same DEA informants

23  that had previously met with him?

24  A    Yes, sir.

25  Q    Did it appear that Mr. Chavful trusted this individual?

1  A    Very much so.

2  Q    Now, what happened on May the 23rd of 2012?

3  A    The confidential or cooperating individual that was

4  mentioned met with Mr. Hurd -- I apologize -- met with Mr.

5  Chavful at Mr. Chavful's t-shirt printing shop in San Antonio,

6  Texas --

7  Q    Okay.

8  A    -- to negotiate for the purchase of -- Mr. Chavful wanted

9  to purchase five kilograms of cocaine and 200 pounds of

10  marijuana.

11  Q    Was this meeting, was it recorded?

12  A    Both audio and video.

13  Q    During the course of the informants' meeting, did Sam

14  Hurd's name come up?

15  A    Yes, sir.

16  Q    So, it eventually -- now, he didn't tell him that it was --

17  that Sam Hurd was involved in the drug transaction, right?

18  A    Correct.

19  Q    But his name did come up?

20  A    Yes.

21  Q    And who did Tyrone Chavful identify who Sam Hurd was to

22  him?

23  A    His cousin.

24  Q    Okay.  So, five kilograms of cocaine and 200 pounds of

25  marijuana?

1    A    Correct.

2    Q    I want to direct your attention specifically to June the

3    6th of 2012 in San Antonio, Texas.  What arrangements had you

4    made concerning Mr. Chavful's offer to buy five kilograms of

5    cocaine and 200 pounds of marijuana?

6    A    We went ahead and obtained exactly 5.4 kilograms of real

7    cocaine and 190 -- approximately 190 pounds of real marijuana,

8    and proceeded to deliver that quantity to Mr. Chavful at his t-

9    shirt shop in San Antonio, Texas.

10   Q    What time did the informant call Mr. Chavful --

11   A    At --

12   Q    -- and tell him that, we're in town and we're almost at

13   your shop?

14   A    At 3:04 p.m.

15   Q    Did he then go to the shop?

16   A    Yes, he did.

17   Q    What happened at the shop?

18   A    The cooperating individual went and met with Mr. Chavful.

19   Chavful asked him if he had the stuff.  He then directed

20   another individual to unlock the back gate and instructed the

21   cooperating individual to go ahead and contact his driver to

22   deliver the narcotics.  The driver, which was an undercover

23   agent, proceeded to deliver the 5.4 kilograms of cocaine and

24   approximate 190 pounds of marijuana.

25   Q    Where did they deliver it to?

1   A   To the -- to Chavful's t-shirt business in San Antonio,

2   Texas.

3   A   Did they unload the drugs from the vehicle?

4   A   Yes, sir.

5   Q   After the drugs were unloaded and -- and basically what

6   happened next?

7   A   Mr. Chavful was placed under arrest.

8   Q   Okay.  Now, did he have any cell phones on him?

9   A   Yes, he did.

10  Q   How many did he have?

11  A   Two.

12  Q   And you have possession of both of those?

13  A   Correct.

14  Q   Now, Mr. Chavful's been indicted along with Mr. Hurd and

15  Toby Lujan.  Is that correct?

16  A   That is correct.

17  Q   I want to direct your attention to July 30th of 2012.  Do

18  you recall that day?

19  A   Yes.

20  Q   What happened on that day?

21  A   We conducted a debrief interview of Tyrone Chavful.

22  Q   Okay.  And who was present during that -- who represented

23  Mr. Chavful during that interview?

24  A   His counsel, Ms. Harper.

25  Q   And did he agree to tell you about everything that he knew

1   about his drug trafficking activities and who was involved with

2   him?

3   A    Yes, he did.

4   Q    Did Sam Hurd's name came up?

5   A    Yes.

6   Q    Specifically, what did he tell you about Sam Hurd?

7   A    Mr. Chavful told us that the narcotics that he had been

8   negotiating for on May 23rd and then the narcotics that he had

9   subsequently received on June the 6th were on behalf of Samuel

10  Hurd.

11  Q    Okay.  Did he state that he -- that prior to that that he

12  was also involved with Mr. Chavful in a drug deal that occurred

13  after Mr. Hurd's release?

14  A    Yes.  On May --

15  Q    Was Mr. --

16  A    On May 2012, Mr. Chavful -- Mr. Chavful said that on May

17  2012, Sam Hurd had purchased approximately 30 pounds of

18  marijuana from Mr. Chavful at the shop for $10,500, which was

19  placed in a blue Igloo and Mr. Hurd walked out of the shop and

20  placed it inside a black Mercedes-Benz that Mr. Chavful -- or,

21  I apologize, Mr. Hurd was driving.

22  Q    Did Mr. Chavful indicate whether or not -- and let's be

23  fair about Mr. Chavful.  He's a convicted felon, correct?

24  A    Yes.

25  Q    In fact, he's on supervised release for a 924(c) conviction

 1   involving marijuana and a gun out of Austin, Texas?

 2   A    Yes.

 3   Q    Did he indicate whether or not Sam Hurd knew that he was a

 4   convicted drug trafficker?

 5   A    Yes.

 6   Q    What did he say -- did he say that -- when was the first

 7   drug-related contact that he had had with Sam Hurd after Sam

 8   Hurd had been arrested in Chicago?

 9   A    I believe it was roughly about April or March of 2012, he

10   had requested -- Samuel Hurd had requested 20 to 30 pounds of

11   hydroponic marijuana.

12   Q    Okay.  And ultimately he ended up getting him marijuana?

13   A    Correct.

14   Q    But was that hydroponic --

15   A    In May 2012.

16   Q    But was that hydroponic marijuana?

17   A    No, it was regular marijuana.

18   Q    Okay.  Now, did he say he knew where Sam Hurd was living at

19   the time?

20   A    Yes.

21   Q    Where was he living?

22   A    He stated that he lived that -- on Windy Pond with his

23   sister.

24   Q    Okay.  Now, do you have --

25   A    Well, let me --

1   Q    Did you develop any --

2   A    Let me go ahead and let me correct that.  I don't -- I

3   don't believe he actually mentioned the street Windy Pond.  He

4   gave an addition, but stated that he resided with his -- he was

5   residing with his sister.

6   Q    But you ultimately learned that he was living with his

7   sister on Windy Pond?

8   A    Correct.

9   Q    Now, did you have -- develop any evidence -- after Mr.

10  Chavful told you that Mr. -- that he was acquiring the cocaine

11  and the marijuana that he was arrested with on June 6th, that

12  he was doing that -- that Sam Hurd was involved in that

13  transaction, did you develop any independent evidence that

14  corroborated his story?

15  A    Yes.

16  Q    Specifically, what did you learn?

17  A    On Mr. Chavful's phones, there was a contact by the name of

18  "Big Sam" listed on his contact list, and that phone number is

19  subscribed to Jawanda Corbin (phonetic), who's believed to be

20  Mr. Hurd's sister.

21  Q    And what address did the subscriber information come back

22  to?

23  A    1027 Windy Pond.

24  Q    Okay.  Did you learn whether or not there was a black

25  Mercedes that was registered to that address?

1   A    Yes.

2   Q    Specifically, who was it registered to?

3   A    Reginald Newsome, believed to be Jawanda Corbin Newsome's

4   husband.

5   Q    Okay.  Did Tyrone Chavful indicate that, you know what,

6   while this drug deal was going down, I called Sam Hurd?

7   A    Yes, he did.

8   Q    Did your examination of his cell phone confirm that?

9   A    Yes.

10  Q    What exactly did you learn?

11  A    During the first meeting on May 23rd, 2012, later that

12  evening, approximately 7:00 p.m., Mr. Chavful had communication

13  with that phone subscribed to Jawanda Corbin, which is --

14  Q    That's programmed --

15  A    -- programmed into his phone as Big Sam and which he

16  identified as a phone being utilized by Samuel Hurd.

17  Q    Okay.

18  A    And then on June the 6th --

19  Q    Well, let me be specific here.  Do you recall testifying

20  that you said that at exactly 3:04 p.m. is whenever the

21  informant said, we're on our way to the shop with the drugs?

22  A    Correct.  On June the 6th.

23  Q    Yeah, on June the 6th.  What does his phone records show

24  after, immediately after he gets off the phone with the

25  informant?

Alarcon - Direct                               50

1   A    That at 3:05 the -- that Chavful contacted Big Sam, and

2   then proceeded to contact him again at 3:06 and then at 3:10.

3   Q    Okay.  How long was the telephone communication that

4   occurred at 3:10 p.m.?

5   A    Approximately 40 seconds.

6   Q    So, enough to have a conversation?

7   A    Yes, sir.

8   Q    Sam Hurd was arrested -- you're aware that Sam Hurd was

9   arrested for violating the conditions of his pretrial release

10  on August the 9th of 2012 in San Antonio, Texas?

11  A    Yes, sir.

12  Q    What kind of vehicle was he driving?

13  A    A black Mercedes-Benz.

14  Q    And was it the one that was registered to his sister's

15  husband?

16  A    Yes.

17  Q    And does it -- did it appear to be consistent with the

18  description of the vehicle that Tyrone Chavful said Sam Hurd

19  was utilizing during his contacts with him?

20  A    Yes, sir.

21  Q    Now, did you develop any other information that

22  corroborated Mr. Chavful's admissions that Sam Hurd was

23  involved in drug trafficking with him while he was on

24  supervised release and while Mr. Chavful -- and while Mr. Hurd

25  was on pretrial release?

1   A    Mr. Chavful had mentioned that Mr. Hurd had a marijuana

2   shop in California that he had to shut down because he was

3   afraid that the government was going to think that he was

4   laundering money through it.  And that same shop was mentioned

5   by Mr. Lujan.  And to our knowledge, Mr. Lujan and Mr. Chavful

6   don't know each other.

7   Q    Okay.

8           MR. TROMBLAY:  That's all the questions I have, Your

9   Honor.

10          THE COURT:  Mr. Ethington?

11                       CROSS-EXAMINATION

12  BY MR. ETHINGTON:

13  Q    I'm sorry.  I couldn't hear your last name when you were

14  introduced to the Court.  What is it?

15  A    Alarcon.

16  Q    Can you spell it, please?

17  A    A-L-A-R-C-O-N.

18  Q    Agent, how long have you been the case agent on the

19  investigation targeting Sam Hurd?

20  A    Since July 28th, 2011.

21  Q    July 28th, 2011?

22  A    Correct.

23  Q    How did that case get initiated?

24  A    We received information from a confidential informant.

25  Q    Who was that?  Are you willing --

1          MR. TROMBLAY:  I object, Your Honor.

2   BY MR. TROMBLAY:

3   Q   Are you willing to share that with us?

4          THE COURT:  Hold on.  Is this an ongoing

5   investigation?

6          MR. TROMBLAY:  Yes, it is.

7          THE COURT:  Objection sustained.

8   BY MR. ETHINGTON:

9   Q   The -- so a confidential informant initiated the case

10  against Sam Hurd?  Is that your testimony?

11  A   The case was initiated against Toby Lujan.

12  Q   Okay.  And that's the person you referred to that called

13  Toby Lujan or Toby Lujan called him that resulted in the --

14  resulted in the arrest and seizure -- or, the seizure of the

15  $88,000?

16  A   Yes, sir.

17  Q   Okay.  And the confidential informant was working at that

18  point under the direction of law enforcement?

19  A   Correct.

20  Q   And from -- so it's July 27, 2011?  Can you share with

21  this Court any direct evidence that you have that associates

22  Sam Hurd -- I'll just get right to the bottom of it -- direct

23  evidence, direct evidence that associates Sam Hurd with drug

24  trafficking?

25  A   First and foremost, he walked out of the steakhouse in

1    Rosemont, Illinois with one kilogram of cocaine.

2    Q    Okay.  Let's -- that was that -- it was supposed to have

3    been Ditka's Steakhouse but transferred to Morton's

4    Steakhouse.  Is that right?

5    A    That's correct.

6    Q    And you've reviewed the tapes of the conversations, as

7    best they could be picked up in a restaurant environment,

8    during this investigation, haven't you?

9    A    Yes, sir.

10   Q    You weren't present sitting at that table where the

11   discussions were had, were you?

12   A    Correct.

13   Q    But there was an undercover I guess DEA agent?

14   A    No.  HSI agent.

15   Q    Okay.  ICE agent or --

16   A    ICE Homeland Security Investigations.

17   Q    And then a confidential informant?

18   A    Correct.

19   Q    And now you said that that was also videotaped, correct?

20   A    Yes, sir.

21   Q    And this was a public place with other patrons of that

22   restaurant sitting around there, correct?

23   A    To include four other law enforcement individuals sitting

24   --

25   Q    So the --

1  A   -- right next.

2  Q   -- tables surrounding the one that was set up for the

3  meeting, that was populated by other undercover agents?

4  A   Correct.

5  Q   And --

6  A   Well, one table.

7  Q   Just one?

8  A   Yes.

9  Q   And there was I think your testimony was about a kilo of

10 cocaine that was brought to that meeting?

11 A   Real cocaine.

12 Q   Real cocaine?

13 A   Yes, sir.

14 Q   If it was real cocaine, how come you had to -- I notice

15 that there was a lab analysis done of it later on.

16 A   Correct.

17 Q   But you knew -- you fellas got that cocaine from the

18 Sheriff's Office up there in the Chicago area somewhere,

19 didn't you?

20 A   Correct.

21 Q   So you knew it was real cocaine?

22 A   Correct.

23 Q   Why did you have it analyzed again, then, a second time?

24 A   At the request of the U.S. Attorney's Office and

25 ourselves, we would do it just to show the -- I guess the --

1   Q    Was there some question as to whether --

2   A    -- potency.

3   Q    -- it was real or not?

4   A    No.

5   Q    Well, I mean, you kept saying real cocaine, real cocaine.

6   A    Well, because we do conduct, every once in a while, we do

7   conduct operations with what we call sham cocaine.

8   Q    Okay.  But your testimony here is that this package that

9   you've described to the judge was real?

10  A    Correct.

11  Q    Okay.  And then do you remember the conversations that are

12  on that tape about where you told us that Mr. Hurd manipulated

13  that package?  Did you hear -- do you remember that

14  conversation?

15  A    No, I -- I wasn't present to hear the conversation.

16  Q    You --

17  A    That was information that was provided to me by the

18  undercover agent.

19  Q    You reviewed that tape, though, didn't you, of the

20  conversation at the table?

21  A    Yes.

22  Q    You listened to it?

23  A    Yes.

24  Q    And do you remember in that conversation they had to --

25  the undercover agent and the informant had to encourage him to

1   try to hold on to it or feel it?

2   A    That's not --

3   Q    They told him to do that?

4   A    No, --

5   Q    Do you remember that --

6   A    -- that's incorrect.

7   Q    Okay.  The tape will speak for itself.  You say it's

8   incorrect?

9   A    To the best of my recollection, that's incorrect.

10  Q    Okay.  Wasn't the purpose of that really for them to

11  acquire his fingerprints on that packaging?

12  A    No, sir.

13  Q    Wasn't the undercover agent and the confidential informant

14  trying to convince him that this was high-grade cocaine and

15  that he should accept it as a present?

16  A    No, sir.  Not as a present.

17  Q    Doesn't the videotape and the audiotapes show that when

18  the meeting broke up that Mr. Hurd left that package at the

19  restaurant and the undercover agent and the informant had to

20  remind him, here's your package, be sure and don't leave it

21  behind?

22  A    Uh, --

23  Q    Do you remember that?

24  A    That's incorrect.

25  Q    Of course, that package was provided by the Government,

1   right?

2   A   Yes, sir.

3   Q   And immediately on exiting the restaurant and going to the

4   parking lot, Mr. Hurd was arrested?

5   A   Once he got into his vehicle.

6   Q   Okay.  Now, backing up, let's go down to San Antonio from

7   Chicago.

8   A   Yes, sir.

9   Q   You've described to the judge about 25 pounds of cocaine,

10  I guess, and 175 pounds of marijuana or whatever that was

11  delivered to this fellow, Chavful?

12  A   25?  No.  It was five --

13  Q   How much was --

14  A   Five kilograms of cocaine and approximately 190 pounds of

15  marijuana.

16  Q   Okay.  Five kilos of cocaine and whatever that marijuana

17  amount was, that was also provided by the Government, wasn't

18  it?

19  A   Yes, sir.

20  Q   Now, back up to my original question:  can you share with

21  this judge any other independent evidence that ties Mr. Hurd

22  to drug trafficking?  I'm talking about something that's not

23  provided by the Government.

24  A   On July 27, 2011, Samuel Hurd provided $88,000 to Mr.

25  Lujan to purchase four kilograms of cocaine.

Alarcon - Cross                    58

1  Q    According to Mr. Lujan?

2  A    Correct.

3  Q    Okay.  Do you have any surveillance that establishes that

4  to corroborate Mr. Lujan?

5  A    Surveillance of--?

6  Q    Yeah, him -- Mr. Hurd giving him the money or --

7  A    No, sir.

8  Q    -- any intercepted phone conversations or anything of that

9  nature?

10 A    No, sir.

11 Q    Okay.  Now, --

12 A    However -- if I may?

13 Q    Go ahead.

14 A    Mr. Hurd himself corroborates that when, during the UC

15 meeting on December the 14th, he's asked if there's going to

16 be any heat from that seizure, and Mr. Hurd says no.

17 Q    The communications that Mr. Hurd had with you about that

18 $88,000 was that he said that was his money, but he never said

19 that that was for drugs, that he knew it was for drugs, did

20 he?  He never said that?

21 A    Correct.

22 Q    Okay.  Now, you started the investigation regarding Sam

23 Hurd in July of last year, more than a year ago?

24 A    Yes, sir.

25 Q    Did you have any surveillance of Sam Hurd during that

1   entire period, other than the restaurant meeting?

2   A    No, sir.

3   Q    No surveillance where you could catch him trafficking

4   drugs or something like that?

5   A    No, sir.

6   Q    No surveillance?

7   A    No.

8   Q    How about wiretaps?

9   A    No.

10  Q    How about subpoenas for his bank records or his phone

11  records or his business records --

12  A    Yes, sir.

13  Q    -- or anything like that to indicate drug trafficking?

14  A    Well, there are subpoenas that corroborate information

15  that was provided to us.

16  Q    Tell the judge what information you got from any of his

17  business records or bank records or phone records that

18  establish drug trafficking.

19  A    Drug trafficking itself?

20  Q    Yes.  Drug trafficking.  You know, money laundering.

21  A    He -- well, we do have records indicating that he was

22  involved in structuring.

23  Q    Well, tell us about it.

24  A    Okay.  He made a deposit into a female's bank account in

25  California.  We subsequently interviewed that female, and she

1   admitted that they had structured that currency.

2   Q   That was marijuana, that medical marijuana shop out there

3   in California, --

4   A   I'm not --

5   Q   -- related to that?

6   A   I'm not sure, sir.

7   Q   You don't know?

8   A   No, sir.

9   Q   Under state law in California, these so-called medical

10  marijuana shops, they are, under state law, legal, aren't

11  they?

12  A   I'm not familiar with California state law, sir.

13  Q   You're familiar with federal law.  They are illegal under

14  federal law, correct?

15  A   Correct.

16  Q   Do you have any directives to target individuals that are

17  associated with these medical marijuana -- so-called medical

18  marijuana shops?

19  A   My understanding is that the Drug Enforcement

20  Administration and Homeland Security Investigations in

21  California do investigate those facilities.

22  Q   And literally there are thousands of them out there in

23  California, from your knowledge.  Isn't that right?

24  A   I don't know.  I wouldn't know the quantity.  But I'm sure

25  there's many.

1   Q   Is the controversy surrounding the conflicts in those laws

2   and investigation of medical marijuana in California, has that

3   impacted your investigation of Sam Hurd in any way?  Or

4   influenced?

5   A   Could you rephrase that, sir?

6   Q   Yeah.  The controversy surrounding this medical marijuana

7   out in California, that controversy and the conflict of the

8   state law/federal law, has that aspect of Sam Hurd's activity,

9   has that in any way affected your investigation of him here in

10  Texas or Illinois?

11  A   Well, for starters, sir, we haven't determined that that

12  marijuana was medical -- for medicinal purposes or what you

13  would say legal on the state basis in California.

14  Q   Agent, you on direct testimony referenced some marijuana

15  shop in California.  That's what I'm asking about.

16  A   Okay.

17  Q   Did that -- related to Sam Hurd.  A marijuana shop related

18  to Sam Hurd in California.  Did that in any way influence or

19  affect your investigation of Sam Hurd here in Texas and

20  Illinois?

21  A   No.

22  Q   Is there a separate investigator out there on that

23  marijuana shop regarding Sam Hurd?

24  A   No, it's -- it's still part of this ongoing investigation

25  here.

1   Q    You're the case agent?

2   A    Correct.

3   Q    And so that medical -- I'm not even going to use the word

4   medical -- that marijuana shop out in California, that is part

5   of your investigation, then?

6   A    Correct.

7   Q    And what are you doing about that?

8   A    It's an ongoing investigation.

9   Q    What are you doing?  What are you investigating?

10          MR. TROMBLAY:  Objection, Your Honor.

11          THE COURT:  Sustained.  I'm not going to let you talk

12   about ongoing investigations.  Ask your next question.

13          MR. ETHINGTON:  Yes, Your Honor.

14   BY MR. ETHINGTON:

15   Q    You told us about this fellow named Chavful and that

16   you've interviewed Chavful.  You call it a debriefing.  The

17   same as an interview, correct?

18   A    Yes, sir.

19   Q    And he said that he was trying to acquire these drugs, and

20   your phrase was on behalf of Sam Hurd?

21   A    Yes, sir.

22   Q    And your corroboration of that, to try to establish that

23   that might be a truthful statement, is some phone call

24   business?  Is that your testimony?

25   A    That's the corroboration that we have at the moment, but

 1  it's still an ongoing investigation and we're still trying to

 2  corroborate other information.

 3  Q   In what way?  What other -- can you share -- give us the

 4  benefit of that?

 5          MR. TROMBLAY:  Objection, Your Honor.  These matters

 6  are ongoing.

 7          MR. ETHINGTON:  Okay.  If it's an on -- the magic

 8  word is ongoing, so I'll withdraw the question.

 9          THE COURT:  Thank you.

10  BY MR. ETHINGTON:

11  Q   In my ongoing investigation of this matter, I'd like to

12  know what else you've got to corroborate the truthfulness of

13  this guy Chavful that seems to be important in these

14  proceedings.

15  A   Well, one thing that we took into consideration is that he

16  implicated himself and admitted that he had -- or was involved

17  in large-scale narcotics trafficking with the cooperating

18  individuals.

19  Q   You're familiar with people that are caught red-handed,

20  where the Government delivers them a large quantity of drugs,

21  then they say, I give up, I'm guilty, and by the way, I'd like

22  to share the blame with other people?  You're familiar with

23  that in investigations, aren't you?

24  A   It's occurred.

25  Q   Huh?

 1  A    It happens.

 2  Q    And did you feel like it might be happening in this case?

 3  A    Mr. Chavful initially invoked his right to counsel, didn't

 4  talk to us, so there was no indication that that's what he

 5  initially wanted to do or was going to do.

 6  Q    In this debriefing, did you let -- did you tell Chavful,

 7  we're interested in hearing information about Sam Hurd; if you

 8  don't tell us something about Sam Hurd that we believe to be

 9  truthful or appears to be truthful, then this interview is not

10  even going to get started?  Is that the way it began?

11  A    No, sir.

12  Q    Did it begin somewhat like that?

13  A    No, sir.

14  Q    What else can you share with the Court that would

15  corroborate this fellow Chavful when the -- it was identified

16  that he was -- a confidential informant approached him and it

17  was identified that he was interested in getting back into his

18  drug trade or trafficking that he'd been involved in.  What

19  else did you guys do to link him to Sam Hurd?

20  A    As I stated previously, sir, the -- at the moment, the

21  things that are linking them are those phone calls.

22  Q    And that's it?

23  A    At the moment, that and, like I said, the fact that he

24  identified or stated, mentioned, that marijuana shop in

25  California, and that same statement was made by a different

1  individual, Mr. Lujan, and those two individuals don't know

2  each other.  Therefore, there was nothing in that interview

3  with Mr. Chavful that leads me to believe that he was being

4  deceitful.

5  Q   Did you have Sam Hurd under surveillance at any time in

6  regard to this activity of Chavful?

7  A   No, sir.

8  Q   Didn't think it was necessary?

9  A   At -- till July -- no, actually, till we debriefed Mr.

10 Chavful, I had -- I personally did not think that Mr. Hurd was

11 involved in narcotics trafficking.

12 Q   Until you debriefed Chavful, --

13 A   Correct.

14 Q   -- you didn't think that Hurd was involved in narcotics

15 trafficking?

16 A   Well, from the time period --

17 Q   Yeah, you just said that now in your testimony.

18 A   Well, I'm --

19        THE COURT:  Mr. Ethington, let him answer your

20 question.

21        MR. ETHINGTON:  Yes, Your Honor.

22        THE WITNESS:  From his date of arrest December 14,

23 2011 till his date of debrief, I didn't suspect that Mr. Hurd

24 was involved in any narcotics trafficking between -- after his

25 arrest.

1          MR. ETHINGTON:  That's all we have, Your Honor.

2          THE WITNESS:  There was no information and belief.

3          THE COURT:  Mr. Tromblay, anything further?

4          MR. TROMBLAY:  We have nothing else, Your Honor.

5                    EXAMINATION BY THE COURT

6          THE COURT:  Agent, let me get something straight.

7  When Mr. Chavful was debriefed in July of this year, --

8          THE WITNESS:  Yes, sir.

9          THE COURT:  -- how did the subject of Mr. Hurd come

10 up?  Was it raised by Mr. Chavful or was it raised by the

11 agents who debriefed him?

12         THE WITNESS:  We raised the question.

13         THE COURT:  Tell me exactly how that came down.

14         THE WITNESS:  We were asking different questions as

15 far as -- based on the meetings on May the 23rd and June the

16 6th, as far as the marijuana, the quantities, as far --

17 because on both meetings Mr. Chavful actually showed the

18 cooperating individual bundles of marijuana.  So we did ask

19 him where he had obtained that marijuana.  He told us it was

20 an individual that he had been -- or that that individual had

21 been supplying him with that marijuana.  So we inquired about

22 him.  And obviously, since he had mentioned Mr. Hurd's name on

23 previous recordings, obviously, we asked about Mr. Hurd, and

24 that's when he told us that that marijuana and cocaine was for

25 Mr. Hurd.

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  We questioned him about everybody

 3   involved in all recordings and everything.  We were as

 4   thorough as could be.

 5              THE COURT:  So Mr. Hurd was one of the names that you

 6   --

 7              THE WITNESS:  Correct.

 8              THE COURT:  All right.

 9              THE WITNESS:  Yes, sir.

10              THE COURT:  All right.  You may step down.

11        (The witness steps down.)

12              THE COURT:  Any further witnesses?

13              MR. ETHINGTON:  Yes.

14              MR. TROMBLAY:  The Government rests.

15              THE COURT:  All right.

16              MR. ETHINGTON:  Your Honor, we have -- may I approach

17   the Court?

18              THE COURT:  You may.

19              MR. ETHINGTON:  We have in the courtroom Mr. Hurd's

20   mother.  I'd like to ask her to stand.  I'm not going to

21   present these people as witnesses.  I just want the Court to

22   be aware that they're supportive and they're available for any

23   kind of sponsorship in restrictive release.  We have mother,

24   we have sister, the sister's here, and we have -- another

25   sister?  Okay.  I didn't meet you earlier.  And we have the
```

1   wife.  And I'm sorry, I didn't meet you, sir.  You're not

2   going to stand up.

3       But we have family members that are supportive from San

4   Antonio, that came up from San Antonio.  They would provide

5   the housing that the San Antonio Pretrial Services would be

6   agreeable to.

7       And that's all we have, Your Honor.

8           THE COURT:  All right.  Thank you.  Argument?  Mr.

9   Tromblay?

10          MR. TROMBLAY:  Your Honor, I'll be brief.  Under 18

11  U.S.C. Section 3148, clearly, Mr. Hurd has committed another

12  felony offense while on pretrial release.  In addition to

13  that, he has continued to use marijuana, drugs that he knew

14  were illegal and drugs that he knew that he was not supposed

15  to consume.

16      Most troubling, since he's been out, and it's been

17  corroborated through independent evidence, that he has

18  continued to traffic drugs since he's been released on

19  supervised -- since he's been released on pretrial release.

20  And in fact, information that cannot be discredited,

21  information that came directly from Mr. Chavful's cell phone

22  that obviously could not have been put in there prior to --

23  after -- that this information was put in prior to his arrest

24  on June the 6th of 2012, and it shows that immediately after

25  the informant contacted him, told him that he's en route to

1    the -- to his t-shirt shop with the cocaine and marijuana, he

2    immediately makes three telephone calls to the number that's

3    subscribed under Big Sam in his cellular telephone, a number

4    that is subscribed to by his sister in San Antonio who he is

5    living with and who has provided him with transportation.  Mr.

6    Chavful was accurate about that, about the black Mercedes.

7        I would submit, Your Honor, that Mr. Hurd -- and you have

8    heard an outline of the case -- that going back to July of

9    2011, $88,000 was seized in his black Cadillac Escalade that

10   was going to be used to purchase four kilograms of cocaine.

11   Despite this cash seizure by law enforcement and despite the

12   fact that he lied to them about what the money was doing in

13   his vehicle, he never ceased trafficking drugs.  And in fact,

14   during recorded conversations that he had with informants and

15   that his associates such as Mr. Lujan had, it's plain that he

16   continued in this illicit and dangerous business, even -- and

17   even though he was given the benefit on a presumption offense

18   in Chicago, even after his release for this, he continued to

19   traffic drugs and continued to disobey the law and use them.

20   And we would submit that there is no condition or set of

21   conditions that can guarantee the safety of the community, and

22   we ask that his pretrial release be revoked.

23        THE COURT:  Mr. Ethington?

24        MR. ETHINGTON:  Very briefly, Your Honor.  It's

25   obvious that he's confessed to these two violations of

1   urinalysis.  And when confronted, he did.  But the allegations

2   of continuing criminal activity are hotly contested, and the

3   Government portrays those -- that evidence as being clear.  I

4   disagree, respectfully.  It's Chavful attempting to try to --

5   he's a convicted felon, he's been in prison, he's been

6   released, and he's pretty savvy of the system, I would guess.

7   He's trying to benefit himself, and that's it.  It's real

8   plain and simple.

9       The Government has had an opportunity to thoroughly

10  investigate Sam Hurd for over a year, and the best they can

11  come with is contraband that was provided to somebody else by

12  the Government and then try to tenuously link it to Sam Hurd.

13       We would ask the Court to consider -- in my last reading

14  of this, which is some time ago, there's home confinement, and

15  there's home incarceration even, which is what I think Mr.

16  Bustamante was referring to.  We would ask the Court to

17  consider that.  Place him on this home incarceration, and then

18  we can try to get this case resolved.  He's got supporting

19  family here that would be almost like third-party custodians.

20  Thank you.

21       THE COURT:  Thank you.

22     Well, let me first state what we're not here on.

23  Notwithstanding Pretrial's report to the Court, this hearing

24  is not about whether he failed two drug tests.  Because were

25  that the situation, we in all likelihood wouldn't be here.

1   What this is about is whether or not the Defendant continued

2   to engage in drug trafficking activity while he was on

3   pretrial release.  The operative statute is 18 U.S.C. Section

4   3148.  The Court finds that there is probable cause to believe

5   that the Defendant did engage in drug trafficking activities.

6   The information provided on debriefing by Mr. Chavful, which

7   was corroborated by telephone calls to the Defendant around

8   that time, are enough to satisfy the Court that the probable

9   cause standard has been met.

10      Having found probable cause to believe that the Defendant

11  committed a federal felony while out on release, the statute

12  creates a rebuttable presumption that there is no condition or

13  combination of conditions that would reasonably assure his

14  appearance as required and the safety of the community.  I

15  think the Defendant has rebutted that presumption through the

16  testimony of the Government's witnesses that he's not a flight

17  risk, but he's wholly failed to rebut the presumption that

18  he's not a continuing danger to the community.  Accordingly,

19  the Court revokes the pretrial release order, remands the

20  Defendant to federal custody pending the disposition of this

21  case.

22      Anything further from the Government?

23          MR. TROMBLAY:  No, sir, Your Honor.

24          THE COURT:  From the Defendant?

25          MR. ETHINGTON:  No, Your Honor.

1          THE COURT:  Parties are excused.  Court is adjourned.

2          THE CLERK:  All rise.

3       (Proceedings concluded at 2:43 p.m.)

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                       CERTIFICATE

20     I certify that the foregoing is a correct transcript from

21  the digital sound recording of the proceedings in the above-

22  entitled matter.

23

24  _____        _____
    Kathy Rehling                           Date
    Certified Electronic Court Transcriber
25  CET**D-444

1                              INDEX

2    PROCEEDINGS                                                3

3    WITNESSES

4    Government's Witnesses    Direct Cross Redirect Recross Court

5    Cecilio Bustamante          3    13      21      22
     Robert Alarcon             27    51                       66
6
     EXHIBITS
7
     -none-
8
     RULINGS                                                  70
9
     END OF PROCEEDINGS                                       72
10
     INDEX                                                    73
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25